**In the Matter of the Disciplinary Proceedings of Robert Marion GORDON, Jr.**

**Nos. 80–8010 and 80–1613.**

United States Court of Appeals, Tenth Circuit.

Feb. 3, 1981.

---

Robert Marion Gordon, Jr., pro se.

W. Allen Spurgeon, Chairperson, Colorado Springs, Colo., for Committee on Conduct.

MEMORANDUM ORDER

Before BARRETT, DOYLE and McKAY, Circuit Judges:

BARRETT, Circuit Judge:

Case No. 80–8010 involves a Show Cause Order issued by this Court, on its own motion, on or about March 19, 1980, upon consideration of the Order of the Supreme Court of the State of Colorado suspending Robert M. Gordon, Jr., hereinafter referred to as Gordon, from the practice of law for three years and until further order of that Court. This Court directed Gordon to show cause why he should not be similarly suspended as a member of the Bar of this Court for three years and until further order of this court. Thereafter, Gordon responded to the Show Cause Order challenging the proceedings leading to his suspension by the Supreme Court of Colorado and notifying this Court that a disciplinary action was then before the United States District Court for the District of Colorado and that this Court should appropriately withhold any action "... until the United States District Court has had an opportunity to review this matter and find out what is going on." [Response to Order to Show Cause, filed March 21, 1980].

Thereafter, Case No. 80–8010 was vacated from the September 17, 1980, hearing calendar, after this Court was advised that Gordon's appeal from the disciplinary action taken against him by the United States District Court for the District of Colorado in Disciplinary Action No. 80–DP–3, by Order entered May 13, 1980, had been docketed in this Court as Case No. 80–1613. Inasmuch as that appeal involved identical challenges to the Colorado proceedings involving the aforesaid suspension, Cases Nos. 80–1613 and 80–8010 were ordered consolidated for briefing, oral argument and submission during the November, 1980, term of this Court.

This Court entertained a full and complete hearing on November 19, 1980. The Respondent and Appellant, Robert Marion Gordon, Jr., appeared in person. The Committee on Conduct, United States District

Court for the District of Colorado, appeared by and through Attorney W. Allen Spurgeon, as its Chairperson.

The entire record of prior proceedings arises from Gordon's appeal in Case No. 80–1613 from the Order entered by the United States District Court for the District of Colorado. Thus, our determination of the issues on appeal in Case No. 80–1613 shall be conclusive in our disposition of the merits of Case No. 80–8010. Accordingly, all record references hereinafter made shall be to Case No. 80–1613.

### Background

The genesis of this proceeding is a complaint, in the nature of a grievance, filed by one Mrs. Anthony Gill, formerly Betty Weirick, surviving spouse of John Weirick, concerning work that Gordon had done or had not done as her attorney. Mr. Gordon was admitted to practice before the Colorado Supreme Court on October 3, 1967. The Weirick complaint was referred to an inquiry panel, reviewed, and recommendation made that formal disciplinary proceedings be undertaken against Gordon.

On September 7, 1978, a Special Prosecutor was appointed. He filed a formal complaint with the Grievance Committee of the Supreme Court of Colorado. Gordon thereafter filed an answer. A pre-trial conference was held. That matter was heard before a three-member hearing committee on January 11 and 12, 1979. The full record of those proceedings is before us here.

Following amendments to the complaint, without objection, the Hearing Committee entered its Findings, Conclusions and Recommendations, approved by the Grievance Committee. Following filing of briefs, the Supreme Court of Colorado rendered its opinion in *People v. Gordon*, (607 P.2d 995, Colo., 1980) accepting the recommendation of the Grievance Committee to suspend Gordon from practice for three years, specially concluding that " . . . the findings and conclusions concerning Respondent's unprofessional conduct and general incompetence to practice law are amply supported by the evidence." The Court specially found:

John Weirick died July 8, 1972, and respondent was employed by his widow, Betty Weirick, to perform legal work necessary to effect the transfer of decedent's assets to her. The only known assets of John Weirick were a home valued at $4,000, owned in joint tenancy with his widow; $20 in their joint-tenancy bank account; an automobile valued at $100 and a pickup truck of no value, both titled in joint tenancy; and the ten thousand shares of capital stock of the Gallium Mines Company, also owned in joint tenancy by the decedent and his widow. Decedent had executed a holographic will naming his widow as his sole beneficiary, and a son by a former marriage as a contingent beneficiary.

Although all of decedent's assets were owned in joint tenancy with right of survivorship, respondent attempted to effect the transfer of these assets by a probate proceeding in the Clear Creek County District Court. Respondent caused an estate to be opened and the will to be admitted to probate, but failed to take further steps to complete the attempted probate of the estate. He did file an inheritance tax application and eventually obtained the necessary releases of the inheritance tax lien from the state.

For the services rendered, Betty Weirick paid respondent $561.25. However, when respondent became aware that probate of the estate was unnecessary, he demanded an additional $400 before he would undertake to close the estate. This additional fee was, in the opinion of an expert witness, excessive for the services involved in closing the estate, even assuming the estate should have been opened in the first instance.

Respondent further insisted that "If the estate were properly handled my fee could be as much as $5,000." He attempted to obtain from Betty Weirick a $5,000 promissory note secured by a deed of trust on her home as security for the payment of the $400 additional fee and possible future fees for services that might be rendered concerning the estate

matters. She refused to execute the security documents.

Respondent also claimed an attorney's lien on the Gallium Mines Company shares of stock that had been delivered to him by Mrs. Weirick for estate processing. He refused to release the certificates, although requested to do so many times, and held them until September, 1974, when Betty Weirick paid him the additional $400 claim, although the estate had never been closed. [R., Vol. I, pp. 14, 15].

Thereafter, on March 14, 1980, pursuant to Rule 25, Local Rules of Practice, United States District Court for the District of Colorado, the Disciplinary Panel of said Court also suspended Gordon from practice in that Court for a period of three years. On March 20, 1980, pursuant to Rule 25, Gordon requested a hearing before the Disciplinary Panel. Attorneys W. Allen Spurgeon and Cathlin Donnell were appointed to represent the Committee on Conduct for the United States District Court for the District of Colorado. Rule 25, which applies to all members of the Court who are disciplined by any other court, state or federal, reads:

> Any member of the bar of this Court who shall be disciplined by any United States Court or by a court of any State, Territory, District, Commonwealth or Possession shall be disciplined to the same extent by this Court unless
>
> (1) the procedure was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
>
> (2) there was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that this court could not consistently with its duty, accept as final the conclusion on that subject; or
>
> (3) the imposition of the same discipline by this court would result in grave injustice; or
>
> (4) the misconduct established has been held by this court to warrant substantially different discipline.

Upon presentation to the Court of a certified copy of the order imposing such discipline the matter shall be referred to the Disciplinary Panel for the entry of an order imposing discipline to the same extent by this court upon the respondent, provided, however, that within thirty days of the service upon the respondent of the order of this Court imposing discipline upon him the respondent may apply to the Disciplinary Panel to hold a hearing to determine whether the discipline in this Court should be modified on the basis of one or more of the grounds set forth.

> The Chairperson of the Committee on Conduct shall appoint one or more members of the Committee to appear at such hearing for the purpose of examining and cross-examining witnesses and offering proof pertinent to the issues.

On March 20, 1980, when Gordon requested a hearing, he alleged:

1. the procedure in the Colorado Supreme Court was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process of law. The complainant Mrs. Betty Weirick was not present at the hearing of the grievance panel and was not available for cross examination. The complaint should have been dismissed.

2. there was such infirmity of proof of any misconduct, so as to give rise to the clear conviction that this court could not consistently, with its duty, accept as final the conclusion on that subject.

3. the imposition of the same discipline by this court would result in grave injustice.

4. the misconduct alleged has been held by this court to warrant substantially different discipline.

On April 30, 1980, a pre-trial conference was held. On May 9, 1980, the Honorable Fred M. Winner, Chief Judge, the Honorable Sherman G. Finesilver, Judge, and the Honorable John T. Kane, Judge, heard the matter. On May 13, 1980, the Panel en-

tered its "Memorandum Opinion", denying Gordon's motion for modification of the March 14, 1980, suspension order.

Gordon appeals from the May 13, 1980, order of the Disciplinary Panel of the United States District Court for the District of Colorado entered in Disciplinary Action No. 80–DP–3. He does not challenge the manner of the proceedings in the United States District Court in terms of lack of notice, lack of due process of law, or otherwise. His challenges are aimed exclusively at the aforesaid state proceedings.

*Scope of Disciplinary Panel's Proceedings*

The Disciplinary Panel of the United States District Court, in our view, recognized and applied the controlling law. The panel cited: *Theard v. United States,* 354 U.S. 278, 282, 77 S.Ct. 1274, 1276, 1 L.Ed.2d 1342 (1957) for the rule that since the state and federal judicial systems are autonomous, discipline in the federal courts does not automatically follow from discipline in the state courts; *Gately v. Sutton,* 310 F.2d 107 (10th Cir. 1962) for the rule that a federal court has no power to review a disciplinary decision rendered by a state court; and, *Selling v. Radford,* 243 U.S. 46, 51, 37 S.Ct. 377, 379, 61 L.Ed. 585 (1917) for the rule that the federal court may recognize and apply the disciplinary decision of the state court unless:

> . . . from an intrinsic consideration of the state record, one or all of the following conditions should appear: 1. That the state procedure from want of notice or opportunity to be heard was wanting in due process; 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not consistently with our duty accept as final the conclusion on that subject; or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction

that, under the principles of right and justice, we were constrained so to do. [R., Vol. I, p. 59].

Having thus recognized the controlling guidelines, the Disciplinary Panel reviewed the record of the state court proceedings and conducted its own disciplinary hearing on May 9, 1980. [*See* R., Vol. II]. The proceedings before the Disciplinary Panel are replete with important, significant inquiries posited by members of the Panel and counsel for the Grievance Committee to Gordon in an effort to ferret out the truth. These queries were designed to and did in fact test the findings/conclusions of the Supreme Court of Colorado. In its Memorandum-Opinion, the Disciplinary Panel said:

> We turn, then, to the limited permitted study of the state court record. Acting on the recommendations of its Grievance Committee, the Colorado Supreme Court found that in representing his clients [Betty and John Weirick] in connection with certain mining claims and in handling the estate of complainant's deceased husband, Mr. Gordon violated Canon 6, DR 6–101(A)(1) through (3) [Failing to act competently], Canon 2, DR 2–106(a) [Charging clearly excessive fees] and wrongful assertion of an attorney's lien.
>
> The record made in the state court before its Grievance Committee shows a dedication to the principles of due process of law. Respondent was given more than reasonable notice of the charges and more than reasonable opportunity to be heard. [There is no *Ruffalo* argument made. See, *In re Ruffalo 390 U.S. 544,* 88 S.Ct. 1222, 20 L.Ed.2d 117.] Respondent complains that his wronged client, Betty Weirick, was not present at the hearing and was not available for cross-examination. If she was subject to subpoena, respondent could have called her. If she was not within the jurisdiction of Colorado, he could have taken her deposition. But, even were these things not so, as the complainant, it is unlikely that she would have testified in respondent's favor, and the case against respondent was made by

witnesses who were present and who were subject to cross-examination. We unhesitatingly reject the first ground of respondent's motion filed in this court.

He next says that "there was such infirmity of proof of any misconduct so as to give rise to the clear conviction that this court could not consistently with its duty accept as final the conclusion on that subject." To the exact contrary, our review of the record leaves us with the clear conviction that the conclusions of the Colorado Supreme Court and its Grievance Committee were entirely correct, and this leads to Mr. Gordon's next claim. He says that imposition of the same discipline by this court would result in grave injustice. In our judgment, imposition of the same discipline results in no injustice, and we think it deserved. Mr. Gordon's assertion that different discipline has been imposed by this court for similar misconduct is not so, nor did he argue this claim. [R., Vol. I, p. 60].

The Disciplinary Panel proceeding conducted by the United States District Court was neither an appellate review of the disciplinary proceeding and decision of the Supreme Court of Colorado nor a "rubber stamp" of those proceedings or the discipline imposed. It is, under Rule 25, *supra*, in law and in fact a "contested case" whereby the state court proceedings and records are tested against the criteria of Rule 25 in terms of finding of fact and judgment as to the discipline imposed. In that sense, the panel virtually sat *de novo* in review of the state court proceedings, except that live testimony was heard and considered anew.

We turn now, in pertinent part, to the testimony elicited before the Disciplinary Panel.

We will first review certain testimony elicited from Gordon which, in our view, completely corroborates and supports the Colorado state disciplinary decision.

After Gordon had testified in narrative manner that he was denied due process of law in the state proceedings and that his dealings with Mrs. Weirick and the Weirick estate were proper, that his services were justified and his fees reasonable, and that the complaint against him filed by Mrs. Weirick was induced by Attorney Sherwood for Amax out of hostility toward him, this interrogation ensued:

*JUDGE FINESILVER*: Wasn't it true, however, that all the property the Weiricks owned was in joint tenancy?

*THE WITNESS [GORDON]*: All right.

*JUDGE FINESILVER*: The $4,000.00 home, the car and any other interests they had? Everything was a joint tenancy?

*THE WITNESS*: No, Your Honor, that is not true. [Here, Gordon explained that the joint tenancy rule would not, in his judgment, apply to the mining claims formerly held by Gallium Mines Company and that simply setting over stock of that corporation jointly held by the Weiricks would not have effected title to the claims]. [R., Vol. II, pp. 35–37].

Gordon stated that the Gallium Mines Company had become defunct and that he proceeded to obtain personal conveyances from the Nedblakes (who owned one-half of the stock in the corporation) to Betty Weirick of the unpatented mining claims inasmuch as the late Mr. Weirick had come to him to "publish out Gordon Nedblake because he has abandoned the project and refused to pay his half of the annual assessment rate." [R., Vol. II, pp. 36–37]. This interrogation followed:

*JUDGE WINNER*: Title [to the mining claims] was in the corporation, wasn't it? How do you publish out a corporate title?

*THE WITNESS*: Well, maybe it [publishing out Nedblake title to the mining claims] wasn't the right thing to do. It left me in a feeling of am I doing the right thing or not …

*JUDGE WINNER*: How much law did you read having to do with publishing out a co-tenant?

*THE WITNESS*: I had the State's Code. That's 30.

*JUDGE WINNER*: Did you read any cases?

*THE WITNESS*: Yes, Your Honor.

*JUDGE WINNER*: Did you find a case that said you could publish out when a title is in the corporation?

*THE WITNESS*: No, I didn't.

*JUDGE WINNER*: All right. [R., Vol. II, pp. 45, 46].

Gordon testified that his charge of $561.00 was justified in relation to the Weirick probate proceeding at an hourly rate of $25.00. This interrogation followed:

*JUDGE FINESILVER*: Isn't it over the bill of $600.00 plus the additional money that you requested when you found out that perhaps the Probate was not necessary and you could have simply filed the death certificate and inheritance tax release to transfer title, and also your activity in regard to requesting Mrs. Weirick in signing the $5,000 promissory note?

*THE WITNESS*: All right. No, that is not it. I had recorded the death certificate. I already have obtained releases of inheritance tax lien. That had already been done.

*JUDGE FINESILVER*: What was the extra money that you requested from her for?

*THE WITNESS*: All right. We have a situation where you have unpatented mining claims and you cannot slumber on those rights. The next thing that I would do would be to have assays made from the ore taken out of those claims to see what was there. To have an appraisal made. To see what the value of those claims were. To offer those properties for sale. Several people had approached me saying that they were interested in buying those unpatented mining claims.

*JUDGE FINESILVER*: Didn't you request $400 more to close the estate?

*THE WITNESS*: That could be. What I was concerned with was not closing the estate. There is no advantage to my client in closing the estate. The important thing is that the will was admitted into probate because, first of all, the original will was lost. A Xerox copy of the holographic will was found. The wit-

nesses to that holographic will were an elderly couple by the name of Davis, and their testimony is in the record.

So the important thing that I felt was that the will be probated while Mr. and Mrs. Davis are available for testimony because if it wasn't and it later became obvious that it was going to become necessary, if Mr. or Mrs. Davis were not around, we would not be able to prove that will.

*JUDGE FINESILVER*: Couldn't that be done by perpetuating their testimony?

*THE WITNESS*: It amounts to the same thing, yes.

*JUDGE FINESILVER*: What is your explanation, please, if any in regard to the allegations that you requested Mrs. Weirick to execute a $5,000 promissory note?

*THE WITNESS*: Right.

*JUDGE FINESILVER*: Secured by a deed of trust on her home as security for the payment of $400 additional fee.

*THE WITNESS*: The problem I had with Mrs. Weirick is that she paid me a hundred dollars, and she had no intention of paying me any more until all of her problems were solved. And you can't solve all the people's problems. I was doing, first of all, the fundamental things that I felt absolutely had to be done.

The bill came to about $400 and $60 more and she wouldn't pay it. And I wrote to her and I sent her a promissory note. The purpose—and I knew she wasn't going to sign the promissory note—the purpose was to impress upon her that there are costs coming ahead not in the range of a hundred dollars or two hundred dollars, but in the range of thousands of dollars.

That was the purpose of my sending her this note. She didn't sign it. There is no exhibit in which she signed the note. I don't know where the original note is, as a matter of fact. But the thing I couldn't impress upon her is that she was thinking in terms of a hundred or two hundred dollars, and she has mining claims that may be worth a million dol-

lars and it's going to require a lot of work. And if she doesn't have confidence in her lawyer, then she should get another lawyer. [R., Vol. II, pp. 47–50].

We next review significant testimony elicited from Mr. Kenneth E. Barnhill, Jr., Attorney at Law, Denver, Colorado, who had served as Chairman of the Hearing Panel appointed by the Vice Chairman of the Grievance Committee of the Supreme Court of Colorado to hear the complaint against Gordon in Case 607 P.2d 995. The panel is one of two composed of members of the Colorado Supreme Court Grievance Committee, consisting of three members. A Special Prosecutor, Attorney Charles Goldberg, was appointed by the Supreme Court of Colorado to present the grievance case against Gordon. [R., Vol. II, pp. 56–60]. Mr. Barnhill, on numerous occasions, specifically requested and suggested that Mr. Gordon obtain an attorney. [R., Vol. II, pp. 60–60A]. Mr. Gordon did not do so. Mr. Gordon did not testify at the hearing and at no time did he request that the Panel issue a subpoena for witnesses. [R., Vol. II, pp. 63, 64]. The following interrogation of Mr. Barnhill is of particular pertinence:

> MR. SPURGEON: Were you and the members of the panel satisfied that each and every allegation contained in the amended complaint had been proven to your satisfaction?
> MR. BARNHILL: Beyond a question. [R., Vol. II, pp. 67, 68].
>
> \*   \*   \*   \*   \*   \*
>
> JUDGE FINESILVER: But there was unanimity as to what you ultimately agreed upon?
> MR. BARNHILL: Absolutely. Not only among the Committee—that's a procedural step, Your Honor, you probably should know about, if you do not already, and that's that the Hearing Committee submits its findings, conclusions and recommendations in writing in advance of a panel meeting of the entire panel, and those we distributed in writing to all members of the panel to which the matter is assigned.

There are nine members. Seven lawyers and two lay people. And these findings and conclusions we submitted in writing in advance and at the meeting, then they are discussed, and there was absolutely—I believe that the record will reflect that all members of the panel signed the recommendations and agreed with the recommendations of the Committee in the form in which they went up to the Supreme Court. [R., Vol. II, p. 70].

Mr. Barnhill, following inquiry of Mr. Gordon whether there was not a conflict of interest in admitting the testimony of Mr. Don Sherwood of Amax relative to the Weirick claims inasmuch as they are located near Amax claims, testified:

> A No, Mr. Gordon, I didn't for several reasons. You cross-examined Mr. Sherwood about that, and my recollection is, A, the properties were not contiguous, B, that Amax had absolutely no interest in the properties of your former client, and more importantly, Mr. Gordon, the validity of the mining claims or value of the mining claims was totally irrelevant to the question which was before the committee that I chaired, and that was your conduct, not the validity of the mining claim[s].
>
> MR. GORDON: Do you think it was my incompetence that induced the probate of the will?
> MR. BARNHILL: The probate of the will was solely unnecessary, Mr. Gordon. There were no assets that were not in joint tenancy. [R., Vol. II, p. 81].

Mr. Barnhill thereafter testified that the title to the subject mining claims was, according to the evidence adduced at the hearing, in the corporation; that the deeds obtained by Mr. Gordon from the Nedblakes were totally useless; that the Gallium Mines Company was not a dissolved corporation; and, the title to the claims was still in the corporation. [R., Vol. II, pp. 81, 82].

### Our Disposition

Our review of the entire record, within the ambits of *Theard v. United States, su-*

*pra,* and *Selling v. Radford, supra,* leads us to conclude that Gordon's appeal is totally without merit. In so concluding, we have independently tested Rule 25 of the District Court for the District of Colorado against the state findings of fact and judgment as to the discipline imposed on Gordon, and we have carefully considered the testimony adduced before the special Disciplinary Panel of the District Court. In performing this duty, we have considered the public interest on the one hand, together with the Bar's abiding concern for high standards in legal ethics and professional service, and, on the other hand, the due process of law required in order to protect an individual from being deprived of the right to practice law in order to sustain life and family, and professional reputation.

We hold that the record supports the conclusion that the state action against Gordon is binding, as found by the District Court, because there is no reason advanced why "... it ought not to be accepted or given effect..." *Selling v. Radford, supra,* at p. 51, 37 S.Ct. at p. 379. Further, we hold that each of the four (4) criteria set forth in Rule 25, *supra,* have been properly found not to impede the adoption of the discipline invoked by the State of Colorado in that (1) the state procedure was not so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; (2) the state proceeding did not result in such an infirmity of proof in establishing the misconduct charged as to give rise to the clear conviction that this court could not, consistently with its duty, accept as final the conclusion on that subject; (3) the imposition of the same discipline [imposed by the State] would not result in a grave injustice; and (4) the misconduct established has not been found by this court to warrant substantially different discipline.

IT IS THEREFORE ORDERED in Case No. 80–1613, that the Order of the United States District Court for the District of Colorado entered in Disciplinary Action No. 80–DP–3, filed May 13, 1980, In the Matter of Robert Marion Gordon, Jr., be, and the same is hereby affirmed in all particulars, including the denial of Gordon's motion for modification of the Court's order of March 14, 1980, suspending Robert Marion Gordon, Jr., as a member of the Bar of the United States District Court for the District of Colorado for a period of three years and until further order of that Court.

IT IS FURTHER ORDERED in Case No. 80–8010 that Robert Marion Gordon, Jr., also known as Robert M. Gordon, Jr. be, and he is hereby suspended from practice in the United States Court of Appeals, Tenth Circuit, until his suspension imposed by the Supreme Court of Colorado is by Order of that Court purged and Gordon is fully reinstated to practice law before the courts of the State of Colorado. The Respondent is directed to file with the Clerk of this Court a certified copy of any order reinstating him aforesaid, concurrent with Respondent's application, if any there be, for re-admission as a member of this Bar.

IT IS FURTHER ORDERED that appellees' motion in Case No. 80–1613 to dismiss Respondent Gordon's appeal and to summarily affirm is hereby denied; and

IT IS FURTHER ORDERED that appellant Gordon, in Case No. 80–1613, forthwith pay and tender the docket fee on his appeal, long overdue, in amount of $65.00.

WILLIAM E. DOYLE, Circuit Judge, concurring.

I concur specially.

The position that I take derives from the fact that we have limited authority to deal with a case such as this one, which comes to us after it has been processed by the state court and also in the federal district court. Moreover, our standards are limited. Rule 25 sets forth the criteria and requires this court to impose the same discipline that the district court has imposed, or as the court of any state, territory, district, etc. has imposed. There is not a lack of notice or opportunity to be heard nor insufficiency of proof in support of the conviction. Nor can it be said that the imposition of the same discipline by this court would result in grave injustice; or that the misconduct es-

tablished has been held by this court to warrant substantially different discipline. Hence, no legal ground is present which would allow us to reverse or modify the judgment.

The opinion of Judge Barrett follows the action taken by the district court which has imposed the same sanction handed down by the Colorado Supreme Court. The only standard which could possibly be regarded as applicable here would be the third standard, which reads, "the imposition of the same discipline by this court would result in grave injustice."

Needless to say, I am unable to say that the imposition of the same discipline by this court would result in grave injustice.

The reason for my lack of enthusiasm for the decision is my belief that the sanction is severe, considering that the offense is not a grievous or a flagrant one. To be sure it displays a gross inability to practice law and to understand the standards of discipline and ethics that apply. On the other hand, there is no evidence that the defendant *intended* to injure his client. What the record reveals is that he lacks legal judgment. His lack of knowledge of a lawyer's duties to his client warrant imposition of some sanction. However, a three-year suspension virtually sounds the death knell. His legal fees were not high, but I think that the hearing panel was concerned by the fact that little or no effort was needed to complete the estate work, since everything was in joint ownership. Even though the fees were not high, they were high from the standpoint of the small amount of property that was being transferred by operation of law.

Nevertheless, I would feel better about the case if a plan could have been put together providing that he return the money that he had collected over and above a reasonable fee for the inheritance tax waiver and for his going through the other small formalities that went with the handling of these transfers.

My other thought would be that perhaps the man could be returned to law school to take some special courses that might impress him with his deficiencies. Thus, if he could take a course in wills and estates from Judge Wade at the University of Denver, and a course in legal ethics. It would also help to require him to study contracts and torts and real property. This would do a great deal more good than merely suspending him for three years. I don't object to the pronouncement of the three-year suspension; however, it seems to me that if he were required to study the mentioned courses, with the provision that the suspension would be lifted at the discretion of the court upon successful completion of them, the order would be much more meaningful. I am not certain that such conditions can be imposed. However, an order from the court would help him gain admission.

I do not disagree with anything that BARRETT, J., has said.